# 2007 DTA 114

**TRIBUNAL DE APELACIONES**
**REGIÓN JUDICIAL DE SAN JUAN**

PEDRO J. ORTÍZ LEBRÓN
Recurrente

v.

ADMINISTRACIÓN DE LOS SISTEMAS DE RETIRO DE LOS
EMPLEADOS DEL GOBIERNO Y LA JUDICATURA
Recurrida

Núm. KLRA-07-00461

San Juan, Puerto Rico, a 18 de septiembre de 2007

Panel integrado por su Presidenta, la Juez Rodríguez de Oronoz,
y los Jueces Ramírez Nazario y Piñero González

Rodríguez de Oronoz, Jueza Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Comparece ante nos el señor Pedro J. Ortiz Lebrón (Sr. Ortiz Lebrón o el recurrente) mediante recurso de revisión administrativa y solicita que revoquemos la *Resolución* emitida el 31 de enero de 2007 por la Junta de Síndicos de la Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura (la Junta). En la misma se confirmó la decisión de la Administración de los Sistemas de Retiro (la Administración) que denegó los beneficios solicitados por el recurrente para obtener una pensión anual por incapacidad ocupacional.

Analizados cuidadosamente y en su totalidad los escritos de las partes, los documentos que obran en el expediente y el derecho aplicable, se confirma la resolución recurrida.

Veamos brevemente los hechos procesales que dieron lugar al recurso que hoy nos ocupa.

**I**

El Sr. Ortiz Lebrón, de 66 años de edad, tiene cotizado para el Sistema de Retiro unos 21.25 años. Laboraba como Oficial de Custodia II para la Administración de Corrección cuando sufrió un accidente del trabajo el 7 de junio de 1999 al resbalar y caer sobre el piso mojado. Como consecuencia del accidente, el Sr. Ortiz Lebrón se lastimó la espalda, cintura, cadera y el brazo derecho por lo que se reportó al Fondo del Seguro del Estado (el Fondo). Luego de la correspondiente evaluación, fue diagnosticado con las condiciones siguientes: *"Esguince Lumbosacral post caída, trauma codo derecho, bulging disc L3 L4, L4 L5, todas estas condiciones relacionadas"*. Como resultado de ello, fue tratado con medicamentos y terapias. Posteriormente, éste desarrolló una condición emocional alegadamente relacionada al accidente del trabajo. Fue referido por el Fondo al Centro Integrado de Salud Mental para las evaluaciones psiquiátricas pertinentes. Allí fue evaluado en seis ocasiones por el Dr. Heriberto Lourido Ferrer desde el 22 de diciembre de 1999 hasta el 9 de junio de 2000.

Así las cosas, el 3 de junio de 2000, el Sr. Ortiz Lebrón presentó una solicitud de pensión por Incapacidad Ocupacional y/o No Ocupacional ante la Administración. La solicitud le fue denegada el 26 de septiembre del mismo año por lo que éste solicitó reconsideración el 9 de octubre de 2000. Mientras esto sucedía, el Sr. Ortiz Lebrón continuaba siendo tratado por el Dr. Lourido Ferrer y luego fue evaluado por los doctores Rafael Miguez Balseiro y Antonio Llona.

La Administración emitió una resolución el 30 de abril de 2001 confirmando su determinación previa de denegar los beneficios de la pensión solicitada. No estando de acuerdo con la decisión, el Sr. Ortiz Lebrón apeló ante la Junta. Ésta celebró una vista administrativa el 17 de abril de 2002 y, posteriormente, confirmó la determinación de la Administración mediante resolución de 29 de mayo de 2003. Aún inconforme, el Sr. Ortiz Lebrón le presentó a la Junta una moción de reconsideración alegando que su condición emocional no había sido evaluada por los médicos de la Administración. La Junta emitió una orden acogiendo la moción de reconsideración para estudio y análisis el 3 de septiembre de 2003.

Posteriormente, el 30 de septiembre de 2003, la Junta emitió una resolución ordenando que el caso fuera devuelto a la Administración para que allí se evaluara la condición emocional del Sr. Ortiz Lebrón. El 28 de octubre de 2004, la Administración informó al recurrente que luego de haber evaluado la evidencia médica relacionada a la condición emocional, se reafirmaba en su denegatoria de conceder los beneficios de la pensión. La Administración determinó que el Sr. Ortiz Lebrón no estaba *"total y permanentemente incapacitado para cumplir los deberes del puesto que en el servicio del patrono se le hubiere asignado"*. Apéndice del recurso, pág. 30.

Ante esa determinación, el recurrente presentó el 22 de noviembre de 2004 una nueva apelación ante la Junta. Luego de varios trámites procesales, el 19 de julio de 2005 se celebró una vista de *"status conference"* donde se separó el 5 de abril de 2006 para la vista administrativa en su fondo y se determinó que sólo se consideraría en ella la parte emocional. Celebrada la vista administrativa, compareció como único testigo el recurrente, quien declaró sobre sus condiciones de salud y los tratamientos recibidos.

Finalmente, la Junta emitió la resolución que hoy nos ocupa el 31 de enero de 2007. En ella, denegó los beneficios de una pensión por incapacidad aduciendo que la condición emocional sufrida por el recurrente como consecuencia del accidente del trabajo no cumple con la severidad requerida para ser considerada como una incapacidad total y permanente. Concluyó que la condición era limitante, pero que no le impide al recurrente realizar las funciones del puesto que ocupaba o las de cualquier otro puesto remunerativo. No conforme con dicha determinación, el Sr. Ortiz Lebrón solicitó a la Junta una reconsideración, la cual fue rechazada de plano.

Inconforme, acude ante nos y solicita que revoquemos la resolución recurrida alegando que:

*"Erró la Honorable Junta de Síndicos al concluir que el recurrente no está total y permanentemente incapacitado para realizar las labores de su trabajo o cualquiera otro que se le pudiera asignar, conforme la evidencia sustancial en el expediente y lo declarado por el apelante el día de la vista."*

## II

### A

Como es sabido, la presunción de corrección que acarrea una decisión administrativa, deberá ser sostenida por los tribunales a menos que la misma sea derrotada mediante la identificación de prueba en contrario que obre en el expediente del caso. *E.L.A. v. P.M.C.,* 163 D.P.R. ___ (2004), **2004 J.T.S. 202;** *A.R.P.E. v. J.A.C.L.,* 124 D.P.R. 858 (1989); *Henríquez v. C.E.S.,* 120 D.P.R. 194, 210 (1989); *Murphy Bernabe v. Tribunal Superior,* 103 D.P.R. 692, 699 (1975). Ello, debido a que los tribunales deben evaluar con deferencia las determinaciones de las agencias sobre asuntos que se encuentren dentro del área de especialidad de éstas. *Rivera Concepción v. A.R.P.E.,* 152 D.P.R. 116, 123-24 (2000); *Fac. C. Soc. Aplicadas, Inc. v. C.E.S.,* 133 D.P.R. 521, 533 (1993); *Asoc. de Drs. Med. C. Salud V. v. Morales,* 132 D.P.R. 567, 589 (1993).

En cuanto a las determinaciones de hechos de los entes administrativos, nuestro más alto foro judicial expresó recientemente lo siguiente:

*"[L]as determinaciones de hechos de las agencias administrativas deben ser lo suficientemente definidas. De este modo se cumple el propósito de poner a los tribunales en posición de revisar de forma inteligente la decisión del organismo administrativo y determinar si **los hechos probados** por la agencia ofrecen una **base razonable** para su evaluación."* *Padín v. Retiro,* 172 D.P.R. ____ (2007), **2007 J.T.S. 151.** (Énfasis del Tribunal).

Al enfrentarse a una petición para revisar una determinación administrativa, el foro judicial deberá analizar si conforme al expediente administrativo: 1) el remedio concedido fue razonable; 2) las determinaciones de hechos están sostenidas por evidencia sustancial en el expediente; y 3) las conclusiones de derecho del organismo

administrativo fueron correctas. *P.R.T.C. v. J. Reg. Tel. de P.R.,* 151 D.P.R. 269, 281 (2000); *Misión Industrial v. J.P. y A.A.A.,* 142 D.P.R. 656, 674 (1997); D. Fernández Quiñones, *Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme,* Ed. Forum, Bogotá, 2da. ed., 2001, págs. 533-36.

En cuanto a la revisión de las determinaciones de hechos de la agencia, la facultad revisora del foro judicial está limitada por lo establecido en la sección 4.5 de la Ley de Procedimiento Administrativo Uniforme, Ley Núm. 170 de 12 de agosto de 1988, según enmendada, 3 L.P.R.A. sec. 2175 (L.P.A.U.). La citada disposición establece que: *"[l]as determinaciones de hechos de las decisiones de las agencias serán sostenidas por el tribunal, si se basan en evidencia sustancial que obra en el expediente administrativo."* Véanse, además, *Asoc. de Vec. H. San Jorge v. United,* 150 D.P.R. 70, 75 (2000); *Domínguez Talavera v. Caguas Expressway Motors, Inc.,* 148 D.P.R. 387, 397 (1999). La evidencia sustancial, por su parte, *"es aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión,"* *Ramírez Rivera v. Depto. de Salud,* 147 D.P.R. 901, 906 (1999); *Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R.,* 144 D.P.R. 425,437 (1997); *Hilton Hotels v. Junta de Salario Mínimo,* 74 D.P.R. 670, 687 (1953).

Ahora bien, según lo dispone la citada sección 4.5 de la L.P.A.U., *supra, "[l]as conclusiones de derecho serán revisables en todos sus aspectos por el tribunal."* El razonamiento detrás de esta disposición, es que los tribunales gozan de peritaje en cuanto a las cuestiones legales por lo cual, en muchas ocasiones, no está presente el interés que justifica la deferencia al criterio administrativo. *San Antonio Maritime v. P.R. Cement Co.,* 153 D.P.R. 374 (2001); *Miranda v. C.E.E.,* 141 D.P.R. 775, 787 (1996). En cuanto a esto, nuestro Tribunal Supremo ha establecido que:

*"Aún cuando la revisión judicial de las decisiones administrativas depende del estatuto involucrado en cada caso, lo cierto es que tanto la apreciación arbitraria de la prueba por parte del organismo administrativo, como la determinación sobre si las conclusiones de hechos que sirven de base a su decisión están sostenidas por **evidencia sustancial**, constituyen una cuestión de derecho."* *Padín v. Retiro, supra.* (Énfasis en el original).

## B

El Sistema de Retiro para los Empleados del Gobierno y la Judicatura de Puerto Rico se rige por la Ley Núm. 447 de 15 de mayo de 1951, según enmendada ▪ (Ley Núm. 447). 3 L.P.R.A. sec. 761 *et seq.* Dicho estatuto establece las circunstancias bajo las cuales un participante del sistema puede ser acreedor de los beneficios por una incapacidad ocupacional o no ocupacional. Para ello, son de aplicación los artículos 2-107 y 2-111 de la referida legislación, ▪ que disponían lo siguiente al momento de los hechos que hoy nos ocupan:

*"**Artículo 2-107***

*Todo participante que, como resultado de una incapacidad que se origine por causa del empleo y surja en el curso del mismo, quedare incapacitado para el servicio, tendrá derecho a recibir una anualidad por incapacidad ocupacional, siempre que:*

*(a) Según se dispone en el Art. 2-111 de esta Ley [3 L.P.R.A. sec. 771] se recibiere suficiente prueba médica en cuanto a la incapacidad mental o física del participante conforme a los criterios normalmente aceptados en el área de la compensación por incapacidad que mediante reglamento fije el Administrador.*

*(b) El participante o el patrono, de acuerdo con los reglamentos de la Junta, notifique al Administrador con respecto a dicha incapacidad.*

*(c) El Fondo del Seguro del Estado determine que el accidente o enfermedad provino de cualquier función del trabajo o que sea inherentemente relacionado al trabajo o empleo. 3 L.P.R.A. sec. 769.*

***Artículo 2-111***

*Para los fines de una anualidad por incapacidad ocupacional o no ocupacional, se considerará incapacitado a un participante cuando la incapacidad está sustentada con suficiente prueba médica conforme a los criterios normalmente aceptados en el área de la compensación por incapacidad que mediante reglamento fije el Administrador y dicha prueba revele que el participante está total y permanentemente incapacitado e imposibilitado para cumplir los deberes de cualquier cargo que en el servicio del patrono se le hubiere asignado o para trabajar en cualquier empleo retribuido con retribución igual, por lo menos, a la que percibe.*

*El Administrador, según lo crea conveniente y necesario, podrá requerir al participante que se someta a exámenes adicionales con médicos seleccionados por el Administrador. 3 L.P.R.A. sec. 771."*

Los criterios a que se refiere la legislación fueron incorporados en el Reglamento General para la Concesión de Pensiones, Beneficios y Derechos a los Empleados del Gobierno de Puerto Rico y sus Instrumentalidades, Núm. 4930, ▇ vigente desde el 25 de junio de 1993 (el Reglamento). Allí se incorpora, por referencia, el Apéndice I (*Adult Listings*) en el que se incluye una lista de criterios médicos aprobados bajo las disposiciones del Título II de la Ley Federal sobre Seguro Social, según enmendada. ▇ Para determinar la incapacidad del solicitante, dicha legislación considera, además, los resultados que surgen de los análisis e investigaciones que realizan los técnicos designados para ello.

Aun cuando el Reglamento hace referencia a los criterios de incapacidad de los reglamentos federales, el Tribunal Supremo de Puerto Rico ha expresado que la determinación de incapacidad al amparo de la Ley Núm. 447 debe *"limitarse exclusivamente a evaluar si la incapacidad del solicitante es tal que le impide realizar las funciones de su empleo o de cualquier otro trabajo remunerativo"*. Padín v. Retiro, supra; Sánchez v. A.S.R.E. G.J., 116 D.P.R. 372, 376 (1985).

Por otra parte, el Reglamento en cuestión señala que se considerará **capacitado** al empleado si no está **total y permanentemente imposibilitado** para cumplir los deberes de cualquier cargo que el patrono le hubiese asignado para trabajar en cualquier empleo retribuido, con un sueldo o retribución por lo menos igual a la que está percibiendo a la luz de su edad, educación y experiencia de trabajo. En consecuencia, y como ha señalado nuestro más alto foro judicial, *"una incapacidad leve, que limite las funciones de su trabajo o de cualquier otro empleo remunerativo, no da base para recibir una pensión bajo el estatuto"*. Sánchez v. A.S.R.E.G.J., supra, pág. 376.

La Regla 24.2 de dicho cuerpo reglamentario dispone los requisitos que deben cumplirse respecto a las pensiones por incapacidad ocupacional. Éstos son:

*"(a) que el participante esté en el servicio activo a la fecha de radicación de la solicitud;*

*(b) que se reciba suficiente prueba médica en cuanto a la incapacidad mental o física del participante;*

*(c) que el Fondo del Seguro del Estado haya determinado que la condición incapacitante esté relacionada con el empleo del participante y es compensable, y*

*(d) que el participante o su patrono notifique dicha incapacidad por escrito al Administrador, dentro de los seis (6) meses siguientes a la fecha en que el Fondo del Seguro del Estado haya determinado que la condición incapacitante está relacionada con el empleo del participante."*

Por su parte, la Regla 24.4 del mismo Reglamento define cuándo se considerará a un participante incapacitado, al disponer lo siguiente:

*"Si de la evidencia médica que consta en el expediente y conforme al listado de criterios médicos ("Adult Listings") establecidos para determinar incapacidad y del análisis e investigación que realicen los técnicos en determinación de incapacidad designados por el Administrador, no se pudiese determinar con certeza la incapacidad, se le podrá requerir al participante que se someta a aquellos exámenes médicos adicionales que se entiendan necesarios para adjudicar en sus méritos la petición de beneficios por incapacidad. Los exámenes médicos adicionales serán realizados por médicos seleccionados por el Administrador. Recibidos los resultados de dichos exámenes, el médico asesor hará la determinación final sobre la incapacidad y someterá su recomendación al Administrador.*

*Se considerará capacitado al participante, si no está total y permanentemente incapacitado e imposibilitado de cumplir los deberes de cualquier cargo que su patrono le hubiere asignado o para trabajar en cualquier empleo retribuido, con un sueldo o retribución por lo menos igual a la que esté percibiendo."*

## III

Conforme a la normativa jurídica esbozada, nos corresponde determinar si la evaluación que hiciera tanto la Administración como la Junta, fue una razonable. Esto es, si las determinaciones de hechos que constan en el expediente fundamentaron la decisión emitida por la Junta y, además, si la misma se encuentra sostenida por evidencia sustancial.

Es norma reiterada que es a la Administración a quien le compete evaluar los criterios fijados por su Reglamento, ponderar la prueba presentada y determinar si un solicitante los cumple o no. No obstante, como tribunal apelativo, es parte de nuestra función revisora evaluar si existe otra prueba en el expediente que reduzca o menoscabe el valor probatorio de la evidencia impugnada, hasta el punto de que no se pueda concluir que la determinación de la agencia fue razonable de acuerdo con la totalidad de la prueba que tuvo ante su consideración. ■

En el presente caso, la Junta confirmó la determinación de la Administración y denegó los beneficios de pensión por incapacidad ocupacional solicitados por el Sr. Ortiz Lebrón. Esto, por entender que su condición emocional, a la luz de la evidencia médica que obra en el expediente administrativo, no cumplía con los criterios médicos de incapacidad total y permanente. Veamos si dicha actuación fue una correcta en derecho.

No hay duda, ni está en controversia, que el accidente sufrido por el recurrente ocurrió por causa de su empleo y en el curso del mismo. Por ello, recibió la compensación y el tratamiento fijado por el Fondo conforme a la incapacidad resultante de dicho accidente. Por ende, si examinamos los requisitos establecidos en el Art. 2-107 de la Ley Núm. 447, *supra,* para aplicar la pensión por incapacidad ocupacional, encontramos que se cumplen el (b) y (c) y que el **único** que está en controversia es el siguiente:

*"(a) Según se dispone en el Art. 2-111 de esta Ley [3 L.P.R.A. sec. 771] se recibiere **suficiente prueba médica** en cuanto a la **incapacidad mental** o física del participante **conforme a los criterios** normalmente aceptados en el área de la compensación por incapacidad **que mediante reglamento fije el Administrador."***

Los criterios a los que se refiere el mencionado artículo son los establecidos en el Reglamento Núm. 4930. Conforme a la solicitud de incapacidad ocupacional, dicho Reglamento establece en su Regla 24.2, como mencionamos, cuatro (4) requisitos entre los cuales el **único** que está en controversia es el siguiente:

*"(b) que se reciba **suficiente prueba médica** en cuanto a la **incapacidad mental** o física del participante."*

Además, la Regla 24.4 del mismo Reglamento dispone que como primer paso para determinar la incapacidad se debe considerar lo siguiente:

Publicaciones JTS presenta dos nuevas obras de Derecho Penal:
Derecho Procesal Penal: Etapa Investigativa y Derecho Penal Sustantivo

JTS

# Ernesto L. Chiesa

# DERECHO PROCESAL PENAL: ETAPA INVESTIGATIVA

Ernesto L. Chiesa obtuvo su bachillerato en Artes (Filosofía) en la Universidad de Puerto Rico en 1964; obtuvo una Maestría en Filosofía en la misma institución en 1967. Luego, cursó estudios doctorales en Lógica en la Universidad de California en Berkeley. En 1974 obtuvo el grado de Juris Doctor –Magna Cum Laude– en la Escuela de Derecho de la Universidad de Puerto Rico. Ha ocupado diversas posiciones en la Universidad de Puerto Rico desde 1964 hasta el presente, incluyendo Catedrático de la Escuela de Derecho donde dicta cursos de evidencia, derecho penal y procedimiento criminal. Ocupó el puesto de Secretario del Tribunal Supremo desde septiembre de 1976 hasta agosto de 1981. Fue colaborador del Tribunal Supremo en la preparación del Proyecto de Reglas de Evidencia que finalmente fuera aprobado en el 1979. Ha publicado sendos artículos de revistas jurídicas. Ha sido principal colaborador de la publicación JTS®™ y autor del Análisis Editorial de Práctica Procesal Puertorriqueña, Evidencia y de la obra Derecho Procesal Penal de Puerto Rico y Estados Unidos. Su Obra Magna es el Tratado de Derecho Probatorio, bajo el sello editorial de Publicaciones JTS. El Profesor Chiesa es continuamente citado por el Tribunal Supremo al igual que por el Tribunal de Apelaciones y los Tribunales de Primera Instancia en Puerto Rico. Entre sus múltiples distinciones profesionales se cuentan: Miembro del American Law Institute; Director de la Conferencia Judicial de Puerto Rico (1990-93); Presidente del Comité de Reglas de Evidencia de la Conferencia Judicial de Puerto Rico (1984-88); Miembro del Comité de Procedimiento Criminal y Evidencia (1984-92); Miembro Honorario del Ilustre Colegio de Abogados Penalistas de Bogotá (1994) y Académico Numerario de la Academia Puertorriqueña de Jurisprudencia y Legislación.

Actualmente preside el Comité del Tribunal Supremo que revisa las Reglas de Procedimiento Criminal (con el objetivo de someter a la Asamblea Legislativa unas nuevas reglas) y es miembro de otro Comité del Tribunal Supremo que revisa las Reglas de Evidencia. Fue miembro del Comité del Tribunal Supremo que estuvo a cargo de la Revisión del Manual de Instrucciones al Jurado. Desde hace más de 18 años, el Profesor Chiesa trabaja como asesor del Secretario de Justicia y del Procurador General en materia de Derecho Penal, Derecho Procesal Penal y Evidencia.

Esta obra pretende presentar una exposición del derecho procesal penal en la etapa investigativa, con énfasis en los derechos constitucionales que amparan al ciudadano en esa etapa del procedimiento. Habida cuenta de la primacía de la Carta de Derechos en esta zona, se alude continuamente a la jurisprudencia de la Corte Suprema de los Estados Unidos y a la del Tribunal Supremo de Puerto Rico, que son las fuentes de derecho primarias. Cómo es harto sabido, los derechos de la persona reconocidos en la Carta de Derechos de la Constitución de los Estados Unidos tienen que ser reconocidos por los gobiernos de los Estados y de Puerto Rico, aunque éstos pueden reconocer garantías adicionales. En el Capítulo I se aborda lo relativo a la aplicación de la Carta de Derechos de la Constitución de los Estados Unidos a Puerto Rico.

En el Capítulo II se expone el derecho que gobierna el interrogatorio de testigos y sospechosos, materia gobernada por las cláusulas del debido proceso de ley, privilegio contra la autoincriminación y asistencia de abogado. Se aborda, además, lo relativo a la determinación de admisibilidad y suficiencia de las declaraciones obtenidas en esa etapa. Aquí, el derecho constitucional es totalmente controlante, con poca regulación estatutaria.

En el Capítulo III se expone el derecho aplicable a los procedimientos de identificación de sospechosos fuera de corte. Se aborda la protección constitucional que brindan el debido proceso de ley y el derecho a asistencia de abogado, y se explica por qué no hay protección bajo el derecho contra la autoincriminación. Se alude también al rol del derecho a la intimidad en esta zona. Por supuesto, se aborda la regulación estatutaria en la Regla 252 de Procedimiento Criminal.

En el Capítulo IV, por mucho el más extenso, se aborda el complicado derecho que rige la protección constitucional contra registros y detenciones irrazonables, tanto bajo la Enmienda Cuarta como bajo la mayor protección que surge de las secciones 1, 8 y 10 de la Carta de Derechos de la Constitución de Puerto Rico. Por supuesto, se considera también la regulación en las Reglas de Procedimiento Criminal, particularmente la Regla 234 que gobierna lo relativo a la moción de supresión de evidencia. Es en este Capítulo que se aborda el derecho constitucional a la intimidad. Se aborda primeramente todo lo relativo a la regla de exclusión en que se traduce la protección constitucional (alcance de la regla de exclusión y la

moción de supresión) y luego se aborda el alcance de la protección constitucional. Esto, a su vez, se divide en las exigencias para una orden judicial de arresto o de registro (warrant clause) y en la exigencia constitucional de razonabilidad para arrestos o registros sin orden judicial. De ahí la necesidad de aludir al derecho que gobierna el arresto sin orden y lo relativo a los distintos registros sin previa orden judicial. También se consideran registros y detenciones particulares, como el "stop and frisk", la detención y registro de vehículos, registros administrativos y otros.

Finalmente, en el Capítulo V se aborda el derecho constitucional contra la autoincriminación. Primeramente se aborda el derecho en general: su alcance, limitaciones, la inmunidad como mecanismo para neutralizar el privilegio, etc. Luego se atiende lo relativo al derecho especial que ampara al ya acusado a no declarar y a que no se hagan inferencias del ejercicio de ese derecho. Aunque esta dimensión del derecho supone ya el inicio de la acción penal (más allá de la etapa investigativa), se incluye para presentar una visión más completa del derecho contra la autoincriminación. En el Capítulo II ya se había abordado el derecho contra la autoincriminación en la zona del interrogatorio de testigos y sospechosos (Miranda y su progenie).

Se advierte que queda fuera de ese libro lo relativo al derecho especial que gobierna la legislación federal especial "antiterrorista", es decir, el Patriot Act y las acciones legislativas y ejecutivas en esta sensitiva zona. Para eso hay que considerar la literatura especializada y esperar por más jurisprudencia de la Corte Suprema que aclare la validez de las limitaciones a los derechos constitucionales de la persona que entraña esa legislación.

Este libro va dirigido a estudiantes, abogados, fiscales y jueces. No hay pretensión alguna más allá de ayudar a éstos a encontrar, y tal vez entender mejor, el derecho positivo que aparentemente gobierna los procesos de investigación criminal tratados en este trabajo. Por supuesto, estamos ante una zona de continuo devenir; se produce mucha jurisprudencia que cambia ese pretendido derecho positivo. De ahí la necesidad de suplementar anualmente este libro para incorporar la jurisprudencia del Tribunal Supremo de Puerto Rico y de la Corte Suprema de los Estados Unidos.

Luis Ernesto Chiesa Aponte es Profesor Adjunto de Derecho Penal en la Facultad de Derecho de Pace University en White Plains, New York. Obtuvo su Bachillerato en Administración de Empresas y revalidó como Contador Público Autorizado. Luego obtuvo su grado de Juris Doctor (Summa Cum Laude) en la Facultad de Derecho de la Universidad de Puerto Rico. Posteriormente, recibió el grado de Maestría en Derecho (LL.M) de Columbia University. Actualmente se encuentra cursando estudios conducentes al grado de Doctor en las Ciencias Jurídicas (J.S.D.) en Columbia University. Una porción de su tesis doctoral, la cual versa sobre ciertos aspectos debatidos de la teoría de la antijuricidad penal, ha sido aceptada para publicación en el Buffalo Criminal Law Review. Además, ha publicado sendos artículos en las principales revistas jurídicas de Puerto Rico sobre distintos aspectos del derecho penal.

Antes de comenzar sus labores docentes en Pace University, Luis Ernesto Chiesa fue Profesor Adjunto de Derecho Penal en la Facultad de Derecho de la Universidad de Puerto Rico y Oficial Jurídico del Juez Presidente del Tribunal Supremo de Puerto Rico, Hon. Federico Hernández Denton. Durante dicho tiempo, fue asesor del Comité para la Revisión del Manual de Instrucciones al Jurado de Puerto Rico adscrito al Secretariado de la Conferencia Judicial.

La teoría de la responsabilidad penal que sirve de base al Nuevo Código Penal es totalmente distinta a la que inspiró el Código Penal de 1974. A consecuencia de ello, bajo el Nuevo Código Penal es posible aducir una multiplicidad de planteamientos que bajo el Código Penal de 1974 no podían defenderse con seriedad. Ahora, por ejemplo, puede argumentarse que quien no contribuyó de forma significativa a la comisión del delito debe ser castigado mucho menos severamente que los verdaderos "autores" de la ofensa (Arts. 43-45 del Nuevo Código Penal). Esto era insostenible bajo la normativa sobre coautoría que se había adoptado en el viejo código (Art. 35 del Código Penal 1974).

Además, conforme al Artículo 9 del Nuevo Código Penal, el principio de favorabilidad ahora claramente aplica también hasta en los casos en que el convicto está cumpliendo su sentencia. Ello era, cuanto menos, dudoso bajo el anterior código. La figura de la tentativa también sufrió cambios.

Ahora solamente pueden hallarse incurso en tentativa quienes ejecutan el último acto necesario para consumar el delito. Según el viejo código, esto no era un elemento esencial de la tentativa.

De otra parte, a tenor con el Artículo 13 del Nuevo Código Penal, ya no rige en Puerto Rico la doctrina de "interpretación restrictiva" de los estatutos penales. Ahora, distinto a lo que ocurría bajo la normativa desarrollada por el Tribunal Supremo en cuanto a este particular, las leyes criminales pueden interpretarse tanto restrictiva como extensivamente. La única interpretación prohibida es la "analógica" en virtud de la cual se crean judicialmente nuevos delitos o penas.

Para entender cabalmente éstos y el resto de los cambios sustanciales que ha sufrido nuestro ordenamiento penal como consecuencia del Nuevo Código, es necesario realizar un análisis comparado de los preceptos contenidos en dicho código. Sólo así puede comprenderse el alcance de las nuevas doctrinas que han sido incorporadas al derecho penal puertorriqueño por medio de este nuevo intento codificatorio. Precisamente ese es el propósito de esta obra.

El análisis que hacemos de la materia equipara al estudiante y al profesional con los conocimientos necesarios para poder sacarle el máximo provecho al Nuevo Código Penal.

Incluimos, además, el texto completo del Nuevo Código Penal con Anotaciones del Lic. Chiesa en relación con la Jurisprudencia Interpretativa del Tribunal Supremo y las enmiendas legislativas que ha sufrido dicho Código. También, se incluye sin costo alguno un DVD que contiene sobre 4,500 págs. de los documentos del historial legislativo del Nuevo Código Penal, que incluyen, entre otros: Los estudios de base, las ponencia de las Vistas Públicas sobre el Código, los Proyectos radicados en el Senado y la Cámara, los Informes de Comisión, el debate y votación final en el Senado y el trámite en la Cámara; el Código Penal y sus enmiendas y las Leyes Complementarias a la Reforma del Código Penal.

*El bosquejo de la obra es el siguiente:*

► Introducción

- Breve recuento del proceso que culminó con la aprobación del Nuevo Código Penal.

- Examen de las bases conceptuales que subyacen al Nuevo Código Penal.

► Limitaciones Constitucionales al Ejercicio del Poder Punitivo

- Implicaciones del debido proceso de ley para la redacción e interpretación de leyes penales

- Leyes Ex Post Facto y la Jurisprudencia Reciente Sobre este Particular

- Proporcionalidad y Castigos Crueles e Inusitados

- Separación de Poderes y el Llamado "Delito Administrativo"

- Los Límites al Poder de Criminalizar Conductas que Impone el Debido Proceso Sustantivo y el Derecho a la Intimidad

► Limitaciones Estatutarias al Ejercicio del Poder Punitivo

- El Principio de Legalidad y sus Cuatro Consecuencias

- La Eliminación de la Regla de Interpretación Restrictiva

- El Problema de las Fuentes del Derecho Penal y la Limitada Aplicabilidad del Principio de Legalidad en Puerto Rico

- El Más Robusto Principio de Favorabilidad del Nuevo Código Penal

    » Los Problemas de la "Tercera Ley"

    » Las Leyes Intermedias

    » Las Leyes Temporales como Excepción a Este Principio (Art. 10 del Nuevo Código Penal)

- El Concurso de Leyes y Delitos

    » Concurso Real

    » Concurso Ideal y Medial

    » Concurso Aparente

    » Delito Continuado

    » Delito Masa – ¿Aplica a Puerto Rico?

► El Primer Eslabón de la Teoría de la Responsabilidad Penal – El Comportamiento Humano

- Acciones Penalmente Relevantes

- Omisiones Penalmente Relevantes

- La llamada Comisión por Omisión (Art. 19 del Nuevo Código Penal)

- La Posesión como Comportamiento

- Casos Límite – Hipnósis, Sonambulismo, Eutanásia

► El Segundo Eslabón de la Teoría de la Responsabilidad Penal – La Antijuricidad

- Elementos Objetivos de la Ofensa

- Causalidad y la Nueva Figura de "imputación objetiva" y "riesgo permitido" (Art. 25)

- Elementos Subjetivos – Dolo Eventual V. "Temeridad" o "Recklessness"

- Los Elementos Subjetivos Distintos a la Intención y su Relación con la Eximente de Intoxicación Voluntaria

- El Error de Tipo del Art. 19 como una Forma de Excluir la Intención

- Las Defensas de Justificación en Puerto Rico – La Nueva y Más Restrictiva Defensa de Estado de Necesidad

► El Tercer Eslabón de la Teoría de la Responsabilidad Penal en Puerto Rico – La Punibilidad

- El Mayor Alcance de la Eximente de Coacción

- La Nueva Defensa de Temor Insuperable

- Las Defensas No-Exculpatorias y el Entrampamiento

INCLUYE CD QUE CONTIENE SOBRE 4,500 PAGS. DE LOS DOCUMENTOS DEL HISTORIAL LEGISLATIVO DEL NUEVO CODIGO PENAL

Publicaciones JTS presenta dos nuevas obras de Derecho Penal:
Derecho Procesal Penal: Etapa Investigativa y Derecho Penal Sustantivo

PO BOX 9024120
SAN JUAN, P.R. 00902-4120
TEL. 721-0200

PRSRT STD
U.S. POSTAGE
PAID
SAN JUAN, P.R.
PERMIT NO. 1176

P.O. Box 9024120
San Juan, P.R. 00902-4120
Tel. 721-0200  Fax. 721-0205
www.pub-jts.com

Sres: Favor enviarme un ejemplar de su nuevo libro:                    Fecha_____

___ Derecho Procesal Penal: Etapa Investigativa (Prof. Chiesa) - $100.00 + $3.50 S/H = $103.50

___ Derecho Penal Sustantivo (Lic. L.E. Chiesa) - $100.00 + $3.50 S/H = $103.50

___ Ambos libros (un ahorro de $50.00) - $150.00 + $6.00 S/H = $156.00

Envíese a Lcdo(a). _____

Dirección _____

_____ Zip Code _____

Tel: _____ Fax _____ E.mail _____

Forma de pago: ___ Adjunto cheque por $ _____ pagadero a Publicaciones JTS.

Cárguese el importe de esta orden ($ _____) a mi tarjeta de crédito: ___ AX ___ MC ___ VISA

Núm. de tarjeta _____ Fecha exp. _____ Firma _____

Autorizo a Publicaciones JTS a renovar automáticamente estas suscripciones a su aniversario (12 meses calendario).
De no desear la renovación enviaré cancelación escrita a Publicaciones JTS.

*"...la **evidencia médica** que consta en el expediente y conforme al listado de **criterios médicos** ("Adult Listing")."*

Este esquema de evaluación se debe ejercer con atención y cuidado. De una lectura integrada de todos los antes citados preceptos se desprende que no hay una definición precisa de lo que constituye *"incapacidad"*, más bien, se establece a base de la inhabilidad para desempeñar aspectos sustanciales y básicos del trabajo en cuestión. En específico, el empleado será considerado capaz si no prueba su incapacidad total y permanente. Siendo los criterios médicos el primer paso del proceso de evaluación, debemos examinar si las condiciones emocionales del recurrente se ajustaban a dichos criterios en el momento en que su expediente fue evaluado para la concesión de los beneficios por incapacidad.

La Junta determinó que era correcta la decisión de la Administración en cuanto a que el conjunto de síntomas o emociones que presentó el recurrente no cumplió con los criterios de severidad de los listados 11.04 (Desorden Afectivo) y 11.06 (Desórdenes relacionados con ansiedad) para otorgar los beneficios de incapacidad. Esto, luego de un *"análisis longitudinal de la totalidad del expediente, la credibilidad de los testimonios y nuestro análisis independiente de las opiniones médicas divergentes en el récord"*. ▇ Concluyó, además, que las condiciones emocionales del recurrente pueden ser controladas mediante medicamentos y que, según surgía de la prueba médica, éste ha conservado aquellas destrezas básicas que requiere el ser humano para seguir funcionando satisfactoriamente. Veamos.

La condición emocional del recurrente comenzó luego del accidente que sufrió en el empleo el 7 de junio de 1999. Estuvo en tratamiento psiquiátrico y fue recluido en una ocasión en el Hospital San Juan Capestrano donde permaneció 10 días en septiembre de 2000. Los desórdenes afectivos y emocionales se han mantenido presentes hasta el momento y el recurrente continúa bajo tratamiento médico con el Dr. Lourido Ferrer. Toda esta evidencia consta en el expediente que tuvo ante sí la agencia en cuestión. También obran revisiones médicas efectuadas por el Fondo y la Administración. ▇ Además, la Junta contó con la evaluación médica del expediente que hiciera el Dr. Ramón Nevares Font, Asesor médico en psiquiatría de la Administración.

La Junta, a base de lo anterior, concluyó que el Sr. Ortiz Lebrón no cumplía con los criterios establecidos ni con el grado de severidad requerido. Le asiste la razón.

Como es sabido, la obligación de probar la incapacidad es de la persona que solicita la pensión. En el presente caso, no se demostró que las condiciones padecidas por el recurrente fueran de tal naturaleza que le inhabilitaran para hacer cualquier otro trabajo que produzca un ingreso en forma ordinaria y estable. La evidencia médica presentada no estableció el parámetro requerido de **incapacidad total y permanente**. De las evaluaciones médicas se desprende que el recurrente siempre ha estado orientado en lugar y persona con memorias no afectadas significativamente y que es completamente capaz de administrar sus fondos y de asistir puntualmente a sus tratamientos. Además, de la transcripción de la vista administrativa ante la Junta se desprende que el recurrente pudo comunicarse efectivamente expresando sin problemas su historial personal y siendo capaz de entender, recordar y seguir instrucciones.

Una evaluación de la totalidad del expediente demuestra que el recurrente presenta unas **limitaciones**. Sin embargo, no demuestran la severidad requerida por la Ley. Núm. 447 para ser acreedor de la pensión solicitada.

Concluimos que las determinaciones de hechos y conclusiones de derecho de la Junta son correctas y están sostenidas por la evidencia recibida y que obra en el expediente. La evidencia presentada por el recurrente no demostró que la determinación denegatoria de los beneficios por incapacidad ocupacional no está justificada por el derecho aplicable y por una evaluación justa del peso de la evidencia. EL recurrente no aportó evidencia que pruebe que la determinación de la Junta no fue razonable. En consecuencia, somos de la opinión que no se justifica la revocación de la resolución recurrida.

**IV**

Por los fundamentos expuestos, se confirma la *Resolución* emitida por la Junta de Síndicos el 31 de enero de 2007.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones